

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

Dear Sir:

> Opinion No. 0-3073
> Re: (a) Proper elements to be
> considered by State Tax Board
> in determining income or earn-
> ings to be capitalized, in
> assessing three described
> "pipe line companies" for ad
> valorem taxes on intangibles
> under Article 7105, Revised
> Civil Statutes. (b) Yardstick
> to be used in measuring or
> classifying a pipe line oper-
> ated in connection with the
> refining or production of
> crude oil. (c) Whether in-
> tangible value attaches or
> adheres to physical or tan-
> gible properties, or to the
> business of transporting oil
> by pipe line.

In your capacity as Ex-Officio Tax Commissioner,
you submitted for the opinion of this Department, the fol-
lowing question, which we quote from your letter of January
20, 1941:

"A recent decision in the case of Col-Tex
Refining Co. v. Bruce Hart et al, 144 S. W. 2nd
909, relative to intangible values, necessitates
my requesting an opinion on the points set forth
below:

"Company C operates a private pipe line in
connection with its oil producing business. In
addition it gathers for other producers in the
same field, on which a gathering charge is made,
against the other producers of five cents per
barrel, or they are allowed to make a five cent

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

Honorable George H. Sheppard, Page 2

profit when the oil is delivered to a common
carrier pipe line. Without the gathering system
the common carrier pipe line would have charged
five cents per barrel for this service.

"Company D operates a gathering system,
in connection with its refinery, but it sells
part of the oil to a common carrier pipe line.
This service would have cost five cents per
barrel, should the common carrier gathered the
oil, as in the case of Company C.

"Company E operates a pipe line under lease
agreement. The properties are owned by a refin-
ery, but the operating company is incorporated
as an oil pipe line company. Or they may buy
oil in the field and sell it to the refinery and/
or other refineries and common carriers, with no
contract to sell, but the sales are made without
any pre-determined profit. The pipe line and/
or marketing company may make more or less than
the gathering charge. The lease agreement may
stipulate, (a) that all ad valorem taxes are to
be paid by the owner (refinery) or (b) that all
ad valorem taxes are to be borne by the lessee
company. Also it may stipulate, (c) that the
rental be paid on a flat rate per month or annum,
or (d) that the rental be based on a per barrel
rate, for example the rate would be three cents
per barrel on all oil gathered.

"The main questions involved may be summar-
ized as follows:

"1. What is gross income, as applied to
a pipe line with no published tariffs? Is oil
trading profits an income in the case of Com-
panies C and D? Are savings on their own oil
to be considered in arriving at their total
gross income?

"2. Is there any yard-stick to be used
in measuring or classifying a pipe line oper-
ated in connection with the refining or pro-

Honorable George H. Sheppard, Page 3

duction of crude oil?

"3. Does an intangible value, as found, attach itself to the physical properties, or to the business of transporting oil by pipe line? It may be presumed that Company E will have office furniture and other property that will be used in their marketing and pipe line business, however the intangible value would ordinarily be apportioned to the counties through which the pipe lines are situated.

"Article 6019 reads, in part as follows:

"'It is declared that the operation of common carrier pipe lines is a business in which the public is interested, and is subject to regulation by law. The business of purchasing, or of purchasing and selling crude petroleum, using in connection with such business a pipe line of the class subject to this law to transport the crude petroleum so bought or sold, shall not be conducted, unless such pipe line so used is a common carrier within the purview of this law. . . ." (Underscoring ours)

"On the presumption that Companies D and E are 'Owning, operating or managing' a pipe line that comes within the above statute, or that they are 'Doing business of the same character in this State'; is their revenue to be predicated on a tariff, where one is established and published by a common carrier pipe line? Or is their income to be considered the same as that oil trading profit from buying, transporting and selling oil? From a practical standpoint, if we are confined to oil trading profits there will be no intangible value. On the other hand, if tariffs are set up on all oil transported, a hypothetical, or earning capacity of the property as distinguished from the actual earnings, is the basis of an intangible value.

"Until the Col-Tex case was decided the pipe line industry had taken the practical construction

Honorable George H. Sheppard, Page 4

of that part of Article 6018 reading as follows:
'The provisions of this law shall not apply to
those pipe lines which are limited in their use
to the wells, stations, plants and refineries
of the owner. . . .' to mean the pipe lines of
the producers of oil from the wells to the lease,
or settling tanks; and the lines from the lease
tanks to the trunk lines as being a part of a
gathering system. Also those lines running from
refinery tank farms to stills, and/or loading
racks or wharves, stations etc., within the re-
finery grounds as being a part of the refinery
equipment; while those pipe lines that brought
oil to the tank farms were a part of transpor-
tation equipment. The Judge, in the above case,
evidently did not consider the construction by
the industry, in arriving at his decision.

"Section 4 of Article 6018 reads as follows'
'Owning, operating or managing or participating
in ownership, operation or management, under
lease, contract of purchase, agreement to buy
or sell, or other agreement or arrangement of
any kind whatsoever, any pipe line or pipe lines,
or part of any pipe line, for transportation
from any oil field or place of production with-
in this State to any distributing, refining or
marketing center or reshipping point thereof,
within this State, or crude petroleum bought
of others; Also in this connection Article 7105
should be read, especially that part reading as
follows:

"'Each incorporated. . . . oil pipe line
company, and all common carrier pipe line com-
panies. . . . engaged in the transportation of
oil . . . in addition to the ad valorem taxes
on tangible properties which are or may be im-
posed upon them respectively, by law, shall pay
an annual tax to the State. . . on their in-
tangible assets and property, and local taxes
thereon to the counties in which its business
is carried on.' The underscored words may be
applied to Company E.

"It should be pointed out here that none
of these companies have declared themselves to

2C5

be common carrier pipe lines, nor have they attempted to exercise the privileges under Articles 6020, 6022 or 6043. However, they do file all reports with the Comptroller of Public Accounts and with the Railroad Commission of Texas, that are required of common purchasers and transporters of crude petroleum. They are either Delaware corporations, or they are incorporated under Articles 1495, 1496, 1497 and 1303.

"Should this not be enough information necessary for you to decide these questions I shall be glad to go into more detail, personally."

You have verbally amplified the foregoing statement in connection with "Company D" by advising us that, as in the case of "Company C", part of the oil handled was either purchased from or transported for other producers in the field and was not confined to the production of said "Company D".

In answering your first question we point out that under principles hereafter discussed, we hold that Companies "C", "D" and "E", above described, are engaged, in part, in businesses of such nature as to bring each of them within the application of Article 7105, Revised Civil Statutes, providing for the assessment, for taxation, of the intangible values of each "oil pipe line company", "common carrier pipe line company" or "other individual company, corporation or association doing business of the same character in this State." However, it does not follow from this conclusion that all gross income received by each of these companies, from every source, can be properly considered by the State Tax Board in computing the intangible values of the businesses enumerated in the statute, under the established principle of "capitalization of net earnings", because such companies, particularly Companies "C" and "D", are also engaged in the producing and refining business, respectively, and such businesses are not within said Act. It is our answer to your first question that the Board may consider as gross income for these purposes, only such income as accrues, directly or indirectly, from the business of transporting crude oil for others for hire or for profit. Thus, if crude oil is transported by the companies in question for other producers, from the point of production to

Honorable George H. Sheppard, Page 6

refineries owned by others, or to connecting pipe line carriers, for a charge or consideration of five cents per barrel, such gross income, along with other income traceable to the business of transporting oil for hire, would be properly considered by the Board in determining intangible value under established formulas, whether such income is designated as carrying, gathering or service charge or tariff. The formal publication of a tariff, under regulations of the Railroad Commission (Article 6043, Revised Civil Statutes) is no condition prerequisite to bringing the companies here within the intendment of the Act taxing intangibles.

But if each of the described companies purchase such crude oil outright from producers and transport same through their gathering system, or pipe line system, to another refinery or to a connecting pipe line, where it is sold for a profit, then, under the case of Reagan County Purchasing Company v. State, 110 S. W. (2d) 794, the Board may consider, in assessing intangible values, only such portion of the total consideration or gross income received by such companies as represents a fair, just and reasonable charge for the carriage or transportation of such oil. The balance, if any, over and above such transportation charges, would be considered as trading profits or income from the purchase and sale of crude oil, and would not be income derived from the business of transporting oil for hire. Corporations chartered under Chapter 15, Title 32, Revised Civil Statutes, such as these are indicated to be, are authorized to pursue both businesses; i.e., transport crude oil by pipe line for hire and buy and sell crude oil.

Upon this point of excluding trading profits in assessing intangible values of such companies, the trial court, in the case of Reagan County Purchasing Company v. State, supra, found:

"'. . . Said value was assessed and fixed by the State Tax Board by a process of "capitalizing" what it understood and believed to be the entire net revenue of the defendant for the year 1934, taking into consideration earnings of said defendant from all of its activities, that is to say, earnings from the purchase and sale of oil, as well as earnings that might be

Honorable George H. Sheppard, Page 7

properly attributed to the transportation of oil;
the computations of said Board being based upon
a gross earning of 20 cents per barrel from each
and every barrel of oil bought, transported and
sold by the said purchasing company during the
calendar year 1934.'"

The trial judge concluded that the assessment
was excessive because the State Tax Board took into con-
sideration the profits earned by the company from the busi-
ness of buying and selling oil, and undertook to determine
what part of the net earnings of said Company was attribu-
table to transportation of oil, so as to fix therefrom the
total taxable value of its oil pipe line business by the
approved method known as "capitalization of net income".

Upon this point the findings of the court are as
follows:

"'(7) I find that only one-fourth (1/4)
of the gross earnings of the defendant on oil
bought, transported and sold by it during the
year 1934, is properly attributable to and should
be allocated to gross earnings as from pipe line
transportation instead of the entire 20 cents
per barrel used by the said Tax Board. While,
as found above, no transportation or tariff charges
are made or published by the defendant, I find as
a fact that 5 cents per barrel would be and con-
stitutes a fair and reasonable charge for the
transportation of such oil if it had been trans-
ported for others for hire, and that 5 cents was
the transportation rate determined and used by
the defendant as the basis for computation of
the Federal Excise Tax on the transportation of
oil by pipe line under Federal statutes existing
at the time said intangible assessment was made.
On the basis of a gross earning of 5 cents per
barrel for all oil transported during the year
1934, and applying thereto the formula adopted
and used by the State Tax Board for determining
the intangible value of the defendant for the
taxable year 1935, I find that 60 per cent of
the intangible value of the defendant, attribu-
table to its pipe line system and operations

Honorable George H. Sheppard, Page 8

as of the year 1935, is $769,408.00. . . ."

Although, in the absence of a cross-assignment of error by the State, the Court of Civil Appeals pointed out that it was unnecessary to determine the question, nevertheless, said court refused to disturb the discretion of the trial court in reviewing and adjudging the correct assessment which should have been made by the State Tax Board in this case.

Under the same reasoning, we do not believe that the Board can properly consider, in computing intangible values of the companies involved here, the worth or value of their pipe lines in the savings effected by them (1) in transporting oil produced by them or purchased from others to the refinery owned by them, (Company D), or, (2) transporting oil produced by them to a connecting common carrier trunk line (Company C). Under the holding of Col-Tex Refining Co. v. Hart, 144 S. W. (2d) 909, such use of a pipe line to transport crude oil would be as a "private pipe line", incidental to the refining business or to the oil producing business, and the value of such pipe lines, when used in the refining or producing business, to dispense with the hiring of common carrier pipe lines, cannot be considered as income derived from the business of transporting oil for hire, within the meaning of Article 7105, Revised Civil Statutes, as interpreted by said case.

In this connection, however, we point out that the State Tax Board, in assessing these described companies for intangible values, may consider the earning capacity of the property as distinguished from the actual earnings. Under the "capitalization of net income" method of valuation, declared by the court to be particularly adaptable to pipe line companies and various other public utility companies, the earnings are merely treated as a guide to the capital value, because the tax is not levied upon the earnings as such. Therefore, in any particular case, the gross receipts to be considered for such purpose are not necessarily the actual receipts but such as would be received under a reasonably economical and prudent management; and the expenses to be deducted, in order to determine the net income, are not necessarily the expenses which were in fact incurred, but

Honorable George H. Sheppard, Page 9

such expenses as would be incurred under a reasonably economic and prudent management. 26 R. C. L. 367; State v. Nevada Cent. R. Co., et al, 81 Pac. 99.

By your second question you ask if there is any "yard-stick to be used in measuring or classifying a pipe line operated in connection with the refining or production of crude oil." This "yardstick" has been definitely laid down by the decision of the Court of Civil Appeals in the case of Col-Tex Refining Co. v. Bruce Hart, et al, supra, and the pertinent statutes. Article 6018, Revised Civil Statutes, after giving four broad definitions of a common carrier pipe line company, provides that "the provisions of this law shall not apply to those pipe lines which are limited in their use to the wells, stations, plants and refineries of the owner and which are not a part of the pipe line transportation system of any common carrier as above defined." In Chapter 15, Title 32, Revised Civil Statutes, governing the creation and operation of corporations for the storing, transporting, buying and selling of oil, gas, salt brine and other mineral solutions, etc., we find Article 1503, providing:

"Nothing in this chapter shall preclude the ownership or operation by any corporation, of private pipe lines in and about its refineries, fields or stations, even though such corporations may be engaged in the producing business."

It was held in the case of Col-Tex Refining Company v. Hart, et al, supra, that a refining company, owning and using a pipe line exclusively for the purpose of transporting oil bought by the company from other producers to the refinery owned by it, was not an "incorporated oil pipe line company", a "common carrier pil pipe line company" or "doing business of the same character" within the terms of Article 7105, Revised Civil Statutes, and hence was not subject to the tax on intangibles thereby assessed. This holding was upon the theory and construction that the intangible tax statute was intended to embrace only such property or facilities as produced for the owner within and of itself, and apart from any other business of the owner, a tangible revenue

Honorable George H. Sheppard, Page 10

or income, and hence carrying system of pipe lines owned
by refining company for use in transporting oil from pro-
duction to such refinery, did not have a tangible value to
which the intangible tax measure attached.

But we are not willing to extend this decision to
cover and exempt persons, firms or corporations using pipe
lines for the transportation of crude oil for hire, even
though such pipe line system is called a gathering system
and is also used in connection with the refining or produc-
ing business of such person, firm or corporation.  In other
words, to bring the owner, lessee or operator of such gather-
ing or pipe line system within the principle announced by
the Col-Tex case, it must be used exclusively (1) to trans-
port oil produced by such owner or operator, and not bought
of others, to a connecting common carrier pipe line for sale
to it or further transporation by it, or, (2) to transport oil
produced or purchased by such owner, operator, or lessee to a
refinery owned and operated by the same person, firm or cor-
poration for processing.

If, on the other hand, such pipe line or gathering
system is used, in addition to the purposes set out above,
(1) for the purpose of transporting, for hire, charge, tariff,
or other consideration, crude oil for other producers from
the place of production to a connecting pipe line for sale
or further transportation, or to a refinery owned and oper-
ated by another person, firm or corporation for processing,
or (2) for the purpose of transporting oil purchased by the
owner, operator or lessee of such pipe line or gathering
system, from others, to a connecting pipe line company for
sale or further transportation, or to the refinery of an-
other person, firm or corporation for sale, then in each of
these situations, exemplified by the companies described
in your letter, it is our opinion that you may lawfully assess
an intangible value, for taxation purposes, by capitalizing
the profit or income which accrues from such transportation,
subject to the above discussed limitations.

By your third question you ask if "an intangible
value, as found, attaches itself to the physical properties,
or to the business of transporting oil by pipe line", pointing

out that "Company E" would have office furniture and other property used in their marketing and pipe line business but intangible value would ordinarily be apportioned to the counties through which the pipe lines were situated. Although an intangible value could not exist in any given case without the presence of tangible or physical properties used in or devoted to the business out of which the intangible value arises, including office furniture and equipment in the instant case, if necessarily incident to the proper conduct of the business of engaging in the transportation by pipe line of crude oil for hire, nevertheless, it is our opinion that such intangible value need not by the Board bp apportioned and certified to the county or counties where such office furniture, and equipment or other tangible property is situated, but the practice, long followed by the Board, of apportioning such intangible values, on a mileage value, to each of the counties through which the pipe line runs, is proper, and may be continued.

In the case of Reagan County Purchasing Company v. State, 110 S. W. (2d) 1194, the court said:

"Intangible values ordinarily result from the profit of a business as actually conducted. They inhere to it as a 'going concern,' in many cases far exceeding the tangible values to which they adhere."

Thus, although intangible value cannot exist, for purposes of taxation, without the existence of tangible or physical properties to which such intangible values adhere and out of which they grow, it is not technically accurate to say that intangible value attaches itself to such physical or tangible properties, so as to have a situs for taxation in the counties where such properties are located, because the intangible value sought to be assessed for ad valorem taxes under Article 7105, Revised Civil Statutes, is the over-all value of the business conducted as a "going concern", which business has a valuation in excess of the valuation of the physical or tangible property used in such business.

Honorable George H. Sheppard, Page 12

Article 7111, Revised Civil Statutes, provides that the Board "shall apportion the sum of the said total taxable values within this State to the counties in which such individual company, corporation or association does business, in proportion to the amount of business done in and the receipts derived from each such company, except, that in case of a railroad company, the apportionment to each county shall be in proportion to the line or lines of such individual, company, corporation or association therein."

Said article further provides that the Board may consider evidence upon the question of apportionment, and may certify and apportion such intangible values according to any method of calculation which it believes to be best calculated "to bring about a just, fair, equitable and lawful apportionment". Adverting to this statutory authority conferred upon the Board, the Court of Civil Appeals in the case of Texas Pipe Line Company v. Anderson, 100 S. W. (2d) 754, upheld the mileage basis of apportionment of the intangible values of a common carrier pipe line company as a method approved by the courts and calculated to reach a just and fair result.

Trusting the foregoing fully answers your inquiry, we are

APPROVED APR 16, 1941

FIRST ASSISTANT
ATTORNEY GENERAL

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Pat M. Neff, Jr.
Assistant

PMN:LM



APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN